IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                Plaintiff,

   v.

JASON L. NICHOLS,

                Defendant.

REPORT AND
RECOMMENDATION

15-cr-51-jdp

_____

# REPORT

On April 22, 2015, the grand jury returned a two-count indictment charging defendant Jason Nichols, a convicted felon, with unlawfully possessing a firearm and ammunition on January 7, 2015 and with unlawfully possession ammunition on January 23, 2015. Dkt. 2. Nichols has moved to suppress the evidence that underlies Count 2, namely statements he made to U.S. Probation Officer Kristin Kiel and the contraband ammunition that she recovered from him as a result of his statements. Dkt. 19. The government opposes this motion, disputing Nichols claim that he was tricked into incriminating himself by Kiel's false assurances of immunity. *See* dkt. 28 (to which Nichols replied in dkt. 29). Essentially, this motion presents a swearing contest. The court accepts Kiel's version of events. For that reason, I am recommending that this court deny Nichols's motion.

On August 6, 2015, the court held an evidentiary hearing on Nichols's motion, at which both Nichols and PO Kiel testified. Having heard and seen the witnesses testify, having made credibility determinations, and having reviewed other documents in the court's files, I find the following facts:

Facts

On October 9, 2013, a grand jury sitting in this district returned a one-count indictment charging Jason Nichols with embezzling $680 from the U.S. Postal Service while Nichols was a postal employee. *See* Case No. 13-cr-124-lsa, dkt. 1. Pursuant to a plea agreement, the government filed a felony criminal information that switched the charge to 18 U.S.C. §500, to which Nichols pled guilty on April 15, 2014. *See* dkt. 17.[1] On July 18, 2015, this court sentenced Nichols to three years of probation. The court imposed the then-standard conditions of supervision, including:

> (3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
>
> \* \* \*
>
> (10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.

Def. Exh. 2; *see also* 15-cr-124, dkt. 29 at 2.

Senior U.S. Probation Officer Kristin Kiel was assigned to supervise Nichols. Kiel has been a U.S. Probation Officer for about 23 years. The policy of the probation office in this district is that its officers do not make promises of any sort to defendants under supervision regarding prosecution or immunity from prosecution.

Kiel knew Nichols had been an avid hunter, so she had several discussions with him regarding firearms, ammunition and hunting; During these conversations, Kiel had warned

---

[1] Postal auditors uncovered a series of improper transactions by Nichols involving stamps and money orders, for a total shortage of $8,296.81, and this is the amount of restitution the court ordered him to pay. *See* May 20, 2014 Presentence Investigation Report prepared by Probation Officer Tamika Jackson, 15-cr-124, dkt. 18, at paragraphs 8-17.

Nichols that possessing just one bullet could lead to the same charge as possessing a handgun. Kiel did not accompany any of these discussions with any request or direction to Nichols that he turn over to her any firearms or ammunition that he might still possess. It Kiel's routine to have such discussions about possessing contraband with defendants she is supervising. Pursuant to this routine, Kiel does *not* ask or direct defendants to surrender any contraband they possess to her.

In January, 2015, Kiel learned that Nichols had been arrested on new state charges by deputy sheriffs in Iowa County, Wisconsin, where Nichols lived (in Rewey, a small town west of Mineral Point). Kiel obtained copies of the deputy sheriffs' reports on or before January 22, 2015, then called Nichols to schedule an appointment to meet with Nichols at his home on January 23, 2015.[2] After this telephone call, Kiel called Nichols a second time to alert him that a new U.S. Probation Officer (Ryan Plender) would accompany Kiel for training purposes. Kiel did not make any statements to Nichols during either of these telephone conversations indicating in any fashion that Nichols would not get into any trouble if he turned over firearms or ammunition to Kiel when they met.

---

[2] The parties have not provided the law enforcement reports to the court. According to Kiel's January 22, 2015 violation report filed in 13-cr-124 (dkt. 31) and the Pretrial Services Report filed in the instant case (dkt. 5), deputies were called to a disturbance at Nichols's home; witnesses reported that Nichols had been drinking and had physically assaulted at least one victim, then had retrieved either a firearm or a knife and was threatening a victim. During their visit, deputies recovered a loaded Taurus .380 handgun, 48 .22 caliber hollow point bullets, a Taurus handgun case containing a magazine with seven .40 caliber bullets, a military-style knife with a sheath, and a zippered gun case that contained no handgun but in which there were numerous types of loose ammunition. These are the items underlying Count 1 of the indictment, which Nichols is not challenging in his suppression motion. The deputies arrested Nichols on charges of being a felon with a gun, battery, and endangering safety/reckless use of a firearm. Kiel states in her violation report that "during past home contacts with Mr. Nichols, he repeatedly denied possessing any firearms or ammunition." Case No. 13-cr-124, dkt. 31 at 2.

On January 23, 2015, Kiel and Plender met with Nichols in his residence, a single-family farmhouse. They started talking about the sheriffs' call and Nichols's arrest; Kiel noted that the deputy sheriffs had reported finding an empty handgun case, and Kiel was concerned about where the other handgun might be. Nichols responded that he had sold that handgun to his girlfriend; when Kiel asked why he hadn't sold the gun *in* its case, Nichols responded that he didn't know.

The three started talking about what constituted contraband: guns, ammunition, and drugs. Kiel asked Nichols if he possessed any of these contraband items. Neither Kiel nor Plender threatened or implied to Nichols that if he did not respond to this inquiry he faced revocation of his supervision. From Kiel's perspective, it was just commonsense not to make such a threat: in order to maintain a good relationship and to ensure her own safety she didn't want to take a chance angering a supervised defendant during a visit to a rural home prompted by an empty gun case.

During this conversation, Nichols stated that he had some ammunition; Kiel asked where it was. Nichols led Kiel and Plender into the unfinished basement. Nichols opened a plastic storage bin, retrieved a gallon-sized container half-full of assorted firearm ammunition and handed it to Kiel. Kiel asked if Nichols had any additional ammunition in the house; he led the officers back upstairs to his den and retrieved two or three shotgun shells out of the pocket of a hunting vest hanging on the wall. Kiel took the shells. This is the first time a defendant ever has provided contraband directly to Kiel. Kiel and Plender left shortly thereafter. (The grand jury subsequently charged Nichols in Count 2 of the indictment with unlawful possession of this ammunition.)

4

The home visit lasted about 15 minutes. Throughout the visit, Nichols was friendly to and cooperative with the officers, and the officers were friendly to Nichols. Neither Kiel nor Plender made any threats or promises of any sort to Nichols during this visit.

Nichols provided materially contrary testimony in his affidavit and at the August 6, 2015 evidentiary hearing. In a nutshell, Nichols testified that following his January 7, 2015 arrest, Kiel advised him telephonically that if he had any additional firearms or ammunition, he had to surrender them to her and she would dispose of them. Nichols claims that although he did not believe he possessed any firearms or ammunition, he asked Kiel if he would get into trouble for turning over firearms or contraband and she responded "no." Later, Nichols claims that he found some ammunition in the basement but left it there without calling Kiel to update her. When Kiel came for her home visit and asked about firearms or ammunition, Nichols claims that, in reliance on Kiel's earlier telephonic assurances, he retrieved and surrendered ammunition from his basement and from his hunting vest. *See* transcript, dkt. 24, at 29-44; July 30, 2015 affidavit, dkt. 20; The court does not accept Nichols's testimony as an accurate account of his conversations and interactions with Kiel.

## Analysis

A government agent's false promise of leniency to a suspect may render involuntary statements made in reliance on the false promise. *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009). For Nichols to succeed on his suppression motion, the evidence must

5

establish that Kiel made a materially false promise to Nichols that overbore his free will.  *Id.*[3] It is the government's burden to prove by a preponderance of the evidence that Nichols's statements and attendant surrender of ammunition were voluntary.  *Id.* at 1128-29.

The parties agree that if Kiel had assured Nichols that he would not get in trouble for turning over firearms or ammunition in his possession, then the government cannot use against Nichols evidence obtained as a result of his reliance on this assurance.  *See, e.g., United States v. Stadfeld*, 689 F.3d at 709.  Cases that address these issues usually turn on the credibility determinations made by the court, because the defendant is claiming that promises were made and broken, while the government responds either that no promises were made, or that the promises made did not prevent the government from using the defendant's statements against him.  *See, e.g., Villalpando,* 588 F.3d at 1129 ("the actual promises made during the interview belie Villalpando's contention that he struck a bargain with the detective . . ."); *United States v. Kontny*, 238 F.3d 815, 819 (7th Cir. 2001)(to obtain suppression of their statements, defendants had to show deceit plus threat or promise; "they showed nothing of the sort and therefore must lose . . ."); *United State v. Stadfeld*, 689 F.3d at 709-10 (defendant's motion to suppress his statements due to false promises of leniency must fail because "neither the state prosecutor nor the John Doe investigators made any threats or false promises of leniency to obtain Stadfeld's statements"); *United States v. Cichon*, 48 F.3d 269, 274 (7th Cir. 1995) (defendant's claim of a breached promise of immunity fails when court finds credible the agents' testimony that they never made such a promise);' *United State v. Cahill*, 920 F.2d at 426 (defendant's claim of a

---

[3]  In *United States v. Cahill*, 920 F.2d 421, 427 (7th Cir. 1990), the court held that a defendant's reasonable perception that he is providing testimony under a grant of immunity could render his statement involuntary, but as the court clarified in *United States v. Stadfeld*, 689 F.3d 705, 710-11 (7th Cir. 2012), this is not true in the absence of coercive tactics by government agents.

breached promise of immunity fails when court finds credible the prosecutor's testimony that he never made such a promise).

This case boils down to such a swearing contest. Each side has culled from the testimony and exhibits the portions that support its arguments that its witness's testimony was logical, consistent and credible while the opposing witness's testimony was illogical, evasive and inconsistent. This is a logical approach by both sides, but it nonetheless brings to mind Judge Levanthal's characterization of how judges approach legislative history: it is "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring). After all, "few honest witnesses testify at any length without at least occasional lapses of memory or need for correction or clarification." *Cook v. O'Neill*, ___ F.3d ___, 2015 WL 5568622 at *7 (7th Cir. Sept. 23, 2015).

Having heard and seen both Kiel and Nichols testify, I have found that Kiel told the truth and I have found as fact her version of events. Nichols, by counsel, accuses Kiel of circumspection, unresponsiveness, and intentional fabrication because she had a motive to lie: her promise of immunity to Nichols violated office policy and she did not want to get herself in trouble. That's not what I heard. As a starting point, Kiel testified that she never told Nichols he would not get in trouble for surrendering contraband, and I believe her. The court's general take-away from Kiel's version of events is that she and Nichols had had the "no-guns-or-ammo" conversation several times while Kiel was supervising Nichols, but Kiel never told Nichols that he would have to surrender this sort of contraband over to her or to law enforcement. In other words, Nichols had plenty of opportunities to dispose of firearms and ammunition on his own,

7

without consequence. Nichols essentially conceded this in his own testimony. Transcript, dkt. 24, at 34. Therefore, Nichols faced no Catch-22 here.[4] As it turns out, however, Nichols's repeated disavowals to Kiel had been false, as Kiel learned from the deputy sheriffs' reports of Nichols's arrest. Nichols explained to Kiel, after his January arrest, that he "forgot" about the handgun and the ammo. Nichols, however, had been able to remember, recover and brandish his handgun in a trice while drunk and angry. Under the circumstances, the court finds Nichols's earlier disavowals of guns or ammo to have been intentionally false.

Equally incredible to the court is Nichols' version of his telephonic *hypothetical* request for an assurance of immunity *before* he knew he had ammunition in the basement, which he did *not* convert to a concrete, real-life assurance *after* he found the ammunition, even though he apparently talked to Kiel on the phone after finding the ammunition but before Kiel and Plender visited. Then, according to Nichols, when Kiel prompted his recollection during her home visit–recall that he had not yet told her he had found a box of ammo in the basement–Nichols did not confirm with her in any fashion the immunity assurance he claims that she had offered during their earlier telephone call. This defies credulity.

Finally, as the government notes, Nichols implicitly argues that Standard Condition (3) of his supervised release compelled him to admit to Kiel that he still possessed ammunition. This argument must be implicit because Nichols claims that he explicitly asked for and received immunity from Kiel; this would have obviated his concern about self-incrimination under Standard Condition (3). In fact, as noted above, Nichols testified that, if he had not been

---

[4] Attorney Zion characterizes Nichols as facing "an unworkable paradox of Hellerian proportion," dkt. 27 at 5 which is a much more lyrical way to phrase it, but it's still a nonstarter.

<pre>
</pre>

offered immunity by Kiel, then he would have disposed of the ammunition on his own (thereby completely avoiding self-incrimination). Transcript, dkt. 24, at 34. Kiel testified that Standard Condition (3) wasn't on anybody's radar. At no time did Kiel threaten to revoke Nichols if he did not truthfully answer her questions about contraband. This would be consistent with her inability to offer immunity and her routine of *not* asking supervised defendants to turn over to her any contraband they might still possess. As a result, under *either* version of the facts, there is no voluntariness concern because Nichols was not confronted with a paradox of Homerian proportion.[5] Tying off the loose thread of this argument, the government correctly notes that these facts do not present any Fifth Amendment self-incrimination concerns . *See United States v. Kappes*, 782 F.3d 828, 850 (7th Cir. 2015), *citing Minnesota v. Murphy*, 465 U.S. 420, 422 (1984); *United States v. Cranley*, 350 F.3d 617, 621-22 (7th Cir. 2003).

Perhaps Nichols has convinced himself that Kiel really did offer him absolution in the abstract, but he has not convinced the court. I will not speculate as to Nichols's actual thought process, but as demonstrated by the cases cited above at 5-7, it is neither unique nor unthinkable for defendants to claim that they were misled by false promises of immunity in circumstances where no such promise was made. There is no inherent illogic in a court reaching this conclusion in a given case and there is no inherent illogic in the court reaching that conclusion here. It's not a matter of tenure and eminence, to use Nichols's phrase it's a matter of what Kiel and Nichols actually said to each other. Having heard and seen them both testify, I have accepted Kiel's version of events. There is no basis to suppress statements or physical evidence.

---

[5] Unlike Odysseus, Nichols was not forced to choose between the Scylla of self-incrimination and the Charybdis of a new petition to revoke his supervised release for failure to answer Kiel's questions.

9

RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny defendant Jason L. Nichols's motion to suppress evidence.

Entered this 28th day of September, 2015.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

September 28, 2015

David Reinhard
Assistant United States Attorney
222 West Washington Avenue, Ste. 700
Madison, WI 53703

Kim M. Zion
Eisenberg Law Offices, S.C.
308 East Washington Avenue
P.O. Box 1069
Madison, WI 53701-1069

  Re: United States v. Jason Nichols
     Case No. 15-cr-51-jdp

Dear Counsel:

  The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

  The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

  In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before October 13, 2015, by filing a memorandum with the court with a copy to opposing counsel.

  If no memorandum is received by October 13, 2015, the court will proceed to consider the magistrate judge's Report and Recommendation.

         Sincerely,
         /s/
         Connie A. Korth
         Secretary to Magistrate Judge Crocker

Attachment

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:
- (1) injunctive relief;
- (2) judgment on the pleadings;
- (3) summary judgment;
- (4) to dismiss or quash an indictment or information;
- (5) to suppress evidence in a criminal case;
- (6) to dismiss or to permit maintenance of a class action;
- (7) to dismiss for failure to state a claim upon which relief can be granted;
- (8) to dismiss actions involuntarily; and
- (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals. *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).